

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

LINDENWOOD CARE CORP., d/b/a )
LOVING CARE HOME, )
                 )
         Appellant, )
                 )
       v. )     WD77654
                 )
MISSOURI DEPARTMENT OF SOCIAL )     Opinion filed:  June 2, 2015
SERVICES, MO HEALTHNET DIVISION, )
                 )
         Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY, MISSOURI
The Honorable Daniel R. Green, Judge

Before Division Four:  Alok Ahuja, Chief Judge,
Joseph M. Ellis, Judge and James E. Welsh, Judge

Appellant Lindenwood Care Corporation d/b/a Loving Care Home appeals from a judgment entered by the Circuit Court of Cole County affirming the decision by the Administrative Hearing Commission ("the Commission").  The Commission determined that, due to Appellant's inadequate documentation of the personal care services provided to Medicaid recipients at Appellant's facility, the Department of Social Services, Mo HealthNet Division ("the Division") had overpaid Appellant $177,812.64.  For the following reasons, the decision of the Commission is affirmed.

Appellant is a residential care facility located in St. Louis, Missouri. In 2006, Appellant entered into a participation agreement with the Division[1] in which it agreed to be a vendor in the Personal Care Program, a program in which the vendor receives reimbursement for providing personal care services to eligible Medicaid recipients. Personal care services include: (1) assistance with dietary needs; (2) assistance with dressing and grooming; (3) assistance with bathing and personal hygiene; (4) assistance with toileting and continence; (5) assistance with mobility and transfer; (6) assistance with medication; and (7) assistance with medically related household tasks. **13 C.S.R. § 70-91.010(2)(B)1-7**.

In the participation agreement, Appellant agreed to "comply with the Medicaid manual, bulletins, rules and regulations as required by the Division . . . in submitting claims for payment." The agreement further provided that "[a]ll services billed through the Medicaid Program are subject to post-payment review" including "unannounced on-site review of records." (Emphasis in original). The agreement also stated that "[f]ailure to submit or failure to retain documentation for all services billed to the Medicaid Program may result in recovery of payments from Medicaid services and may result in sanctions to the provider's Medicaid participation."

On January 20, 2010, the Division conducted an unannounced, post-payment review at Appellant's facility. Cathy Schulte, a Division employee, entered Appellant's facility, provided Appellant with a list of residents, and requested Appellant's billing records for the personal care services that Appellant provided to those residents from April 2009 through November 2009. In doing so, Schulte provided Appellant with a

---

[1] At the time Appellant entered into the agreement, the MO HealthNet Division was known as the Division of Medical Services

"Document Disclosure Statement" that stated that Appellant "received the attached list of claims and/or MO HealthNet participants" and understood that the Division was requesting the disclosure of "all documents supporting billings submitted to [the Division] or its agents for services billed" for those participants.

One of Appellant's employees signed the disclosure statement and provided Schulte with documents titled "personal care documentation record." Each record pertained to a particular resident and consisted of a grid in which three sets of six personal care tasks[2] were listed in horizontal rows and the days of the month were listed in vertical columns. Employees would initial the box corresponding to the personal care service they were providing the resident on that particular day and shift. The records also included a space for "supervisor/client signature." The Division scanned these records as well as the residents' care plans that Appellant had on file. Care plans are plans developed by the Department of Health and Senior Services ("DHSS") that set forth the units of personal care services authorized for each Medicaid recipient.

On February 18, 2010, the Division issued a final decision in which it concluded that it had overpaid Appellant $181,261.95 for personal care services. The decision included an attachment, which explained that Appellant's billing errors fell into the following three categories:

A. There is no documentation of any services provided on this date/during this billing period

B. There is no entry for the participant's signature for certain dates of service on the time sheet documenting Personal Care delivered for this

---

[2] Testimony at the hearing indicated that the set of six personal care tasks was repeated three times in order to correspond with the three work shifts at Appellant's facility.

3

month and/or if signed, the signature on the timesheet has been identified as that of an employee of the provider

C: [Appellant] billed for the full allocation of Personal Care units for the period billed; the time sheet analyzed shows no services delivered on at least one day in that period

The decision indicated that state regulations permitted the Division to sanction Appellant for such errors and that repayment of the overpaid funds could be accomplished by the Division withholding current reimbursement funds.

On February 25, 2010, Appellant filed a complaint with the Commission alleging that the Division's audit was erroneous. In its answer, the Division denied its audit was erroneous and alleged it had cause to recover overpayment from Appellant based on Appellant's violation of several state regulations pertaining to documentation of personal care services.

The Commission subsequently conducted a hearing at which Schulte testified on behalf of the Division. Schulte explained that, upon arrival, she asked "for any and all records that would substantiate the claims billed to [the Division]." She also explained that it is the Division's policy not to "accept additional documentation once the overpayment letter had been issued." Schulte further testified that she requested the residents' personal care plans, but that the plans provided by Appellant were outdated; thus she "could not compare the actual tasks that were authorized to what [was] on [Appellant's] documentation record." Therefore, the Division "had to work under the assumption that the tasks that [Appellant] documented were the tasks that were authorized" under the current care plans. She then explained how, in comparing the personal care documentation records to the units billed, she found the three reoccurring billing errors listed above.

4

Gina Maxwell, Appellant's office manager, also testified at the hearing. During Maxwell's testimony, Appellant offered two exhibits into evidence. One was a disk containing its residents' medication administration records. The second exhibit consisted of a table created by Maxwell detailing the personal care services Appellant alleged were approved for each resident. With the aid of these exhibits, Maxwell testified that all units of personal care service allocated to Appellant's residents were for medication administration and that she was not aware of any residents who had personal needs in the areas of dietary, grooming, bathing, mobility, or toileting. She went on to explain that records regarding medication administration were kept in the residents' charts, which she did not give to the Division. She further testified that the residents at Appellant's facility were mentally ill and, as part of their admission agreements, had delegated the authority to the aides to sign for any personal care services rendered.

On March 14, 2012, the Commission issued its decision in which it concluded that the Division overpaid Appellant $177,812.64 for personal care services that were inadequately documented. In particular, the Commission found that the majority of Appellant's documentation errors stemmed from Appellant's failure to comply with the state regulation requiring residents or a "responsible person" to sign-off on all personal care services administered. The Commission also rejected Appellant's argument that all personal care service units were allocated for medication administration and not the other personal care services documented in the personal care documentation records. The Commission further determined that Appellant's record keeping deficiencies

constituted widespread, serious offenses for which sanctions were appropriate[3] and ordered the sanctions to be carried out through recoupment of the overpaid amount from current payments.

On April 1, 2012, Appellant filed a petition for judicial review in the Circuit Court of Cole County. The circuit court subsequently affirmed the Commission's decision.

Appellant now raises five points on appeal from the Commission's decision.[4] We will uphold the Commission's decision "unless it is not supported by competent and substantial evidence upon the whole record; it is arbitrary, capricious, or unreasonable; it is an abuse of discretion; or it is otherwise unauthorized by law or in violation of constitutional provisions." *Faenger v. Bach*, 442 S.W.3d 180, 186 (Mo. App. W.D. 2014) (internal quotation omitted). "Though we do not view the [Commission]'s factual findings in the light most favorable to the decision, we still must defer to its credibility findings, as the [Commission] is the sole judge of the credibility of witnesses and the weight and value to give to the evidence." *Id.* (internal quotation omitted). "We review the [Commission]'s conclusions regarding the interpretation and application of law *de novo.*" *Indep. Living Ctr. of Mid MO, Inc. v. Dep't of Soc. Servs., Mo. HealthNet Div.*, 391 S.W.3d 52, 56 (Mo. App. W.D. 2013).

---

[3] The Commission determined that there was cause to sanction Appellant under the following five provisions: (1) 13 C.S.R. § 70-3.030(3)(A)4 (failure to make available and disclose to the Division all records relating to services provided to Medicaid recipients); (2) 13 C.S.R. § 70-3.030(3)(A)7 (breaching the terms of the MO HealthNet provider agreement or any written and published policies and procedures of the Medicaid program); (3) 13 C.S.R. § 70-3.030(3)(A)31 (failing to take reasonable measures to review claims for payment for accuracy, duplication or other errors caused or committed by employees when the failure allows material errors in the billing to occur); (4) 13 C.S.R. § 70-3.030(3)(A)33 (failing to retain adequate documentation for five years of the services provided or other documents or records verifying the data transmitted to a billing intermediary); and (5) 13 C.S.R. § 70-3.030(3)(A)37 (failing to comply with "provisions of the Missouri Department of Social Services, MO HealthNet Division Title XIX Participation Agreement").

[4] "On an appeal from the trial court's review of [the Commission's] decision, we review the decision of the [Commission], not the judgment of the trial court." *Faenger*, 442 S.W.3d at 185-86 (internal quotation omitted).

6

In its first point, Appellant contends that the Commission erred in not entering judgment on the pleadings in its favor because Respondent cited to non-existent regulations[5] in its answer as the basis for sanctioning Appellant. Appellant, however, fails to cite to any portion of the record in which it requested the Commission enter judgment on the pleadings.[6]

Moreover, Appellant's contention that it is entitled to judgment on the pleadings stems from perceived deficiencies in the Division's answer. Nevertheless, Appellant failed to raise such arguments prior to the hearing before the Commission.

When a petitioner files a complaint seeking review of an agency's action, the agency must respond and include in its answer "[a]llegations of any facts on which the [agency] bases the action" and "[a]ny provision of law that allows the [agency] to base the action on such facts." **1 C.S.R. § 15-3.380(2)(E)1-2**. When the agency's answer fails to conform to these rules, the petitioner can file a motion with the Commission seeking a remedy. **1 C.S.R. § 15-3.380(7)(A)**. Such remedies include deeming all or any part of an opposing party's pleading admitted, barring or striking evidence on any issue, or deeming any defenses to the complaint waived. **1 C.S.R. § 15-3.425(2)(A)-(C)**; **1 C.S.R. § 15-3.380(7)(C)**. Such motions, however, must be filed no "fewer than

---

[5] In its answer, the Division cited "13 CSR 70-3.030(A)2, 4, 7, 10, 17, 21, 31, 33, 37, 38, and 39" as the basis for sanctioning Appellant. Such regulations, however, do not exist. Rather, as the Commission found, the Division omitted a single digit – 13 C.S.R. § 70-3.030**(3)**(A) – in citing the basis for its sanctions. The Commission concluded that, despite the Division's incorrect citation, the answer provided sufficient notice of the grounds for the Division's action.

[6] From our review of the record, it appears that Appellant raised the issue of the Division's allegedly deficient answer for the first time in a post-hearing motion titled "[Appellant's] Motion to Strike Portions of [the Division's] Proposed Findings of Fact and Conclusions of Law." In that motion, Appellant stated that "the entire case should be dismissed in view that the Answer fails to set forth any legal basis for sanctions, including withholding funds." At no point in the motion, however, did Appellant request judgment on the pleadings.

7

thirty (30) days before the hearing on the complaint or the motion shall be waived." **1 C.S.R. § 15-3.380(7)(B).**

Here, Appellant asserts that the Division's answer is deficient because it fails to accurately cite the provisions of law upon which the Division based its actions. Appellant, however, failed to file any motion with the Commission prior to the hearing on the complaint. Accordingly, Appellant waived any challenge to the sufficiency of the Division's answer. Point denied.

In its second point, Appellant contends that the Commission erred in entering its decision in the Division's favor because "in order to determine the adequacy of recordkeeping, the [Division's] auditor [Schulte] should know the type of facility she inspected, and the type of services the facility [was] authorized to provide." Appellant further avers that the fact that Schulte "assumed" that the care plans on file were accurate for purposes of the audit "shows that the agency acted arbitrarily and capriciously."

On cross-examination, Appellant's counsel questioned Schulte regarding the definition of a residential care facility. Schulte testified that she did not know what type of business an "RCF" was or what type of people lived at Appellant's facility. Schulte further testified that the care plans she requested from Appellant were outdated and, thus, she could not compare the actual tasks authorized by DHSS to what was on the personal care documentation records. Therefore, the Division "had to work under the assumption that the tasks that [Appellant] documented were the tasks that were authorized" under the residents' current care plans.[7]

---

[7] The Division contends that Appellant benefitted from Schulte's assumption that the services documented were the personal care services currently authorized by the DHSS for each resident.

8

Appellant contends that such testimony exemplified that the Commission "should have discredited every aspect of Ms. Schulte's testimony because Ms. Schulte not only did not know what type of residents lived at an RCF, but also she 'assumed' that the documents she saw contained the information she needed to see." Such contentions, however, amount to an attack on Schulte's credibility as a witness. The Commission "is the sole judge of the credibility of witnesses and the weight and value to give to the evidence." *Faenger*, 442 S.W.3d at 189 (internal quotation omitted). We defer to the Commission's credibility determinations and "are not permitted to substitute our judgment for the judgment of the [Commission]." *Kerwin v. Mo. Dental Bd.*, 375 S.W.3d 219, 230 (Mo. App. W.D. 2012). Therefore, any complaints regarding Schulte's credibility as a witness are not for this Court to decide. Point denied.

In its third point, Appellant asserts that the Commission erred in finding that Appellant provided inadequate documentation of the personal care services for which it billed the Division. In particular, Appellant avers that its exhibits and Maxwell's testimony establish that all personal care service units were for medication administration and were adequately documented in the residents' medication administration records, which the Division failed to request during its on-site review.

The Division determined that Appellant was subject to sanction due to Appellant's inadequate documentation of the personal care services rendered to its residents. The majority of Appellant's inadequacies stemmed from its failure to include the resident's or a supervisor's signature on the personal care documentation records.

For purposes of reimbursement, 13 C.S.R. § 70-91.010(4)(A)2F requires a facility's personal care documentation records to contain the following:

For each date of service: the signature of the recipient, or the mark of the recipient witnessed by at least one (1) person, or the signature of another responsible person present in the recipient's home or licensed Residential Care Facility I or II at the time of service. "Responsible person" may include the personal care aide's supervisor, if the supervisor is present in the home at the time of service delivery. *The personal care aide may only sign on behalf of the recipient when the recipient is unable to sign and there is no other responsible person present.*

(Emphasis added). Thus, the regulation requires the recipient's signature or mark for each date of service. If the recipient is unable to sign or make his or her mark, then a "responsible person" present at the facility at the time of service may sign. While personal care aides can sign on behalf of the recipient, they may do so only when (1) the recipient is unable to sign and (2) no other responsible person is present.

The Commission determined that Appellant's personal care documentation records were inadequate primarily "because they are signed by aides who delivered services rather than the service recipients or facility supervisors." In doing so, the Commission noted Maxwell's testimony that, because residents at Appellant's facility were mentally ill, they were unable to sign for themselves and, upon admission, had designated the authority to sign to the aides administering the service. Nevertheless, the Commission found that Appellant failed to comply with the regulation because the services were being provided in a residential care facility where a responsible person, such as a supervisor, would have been present and could have signed on the recipient's behalf.

Our review of Appellant's personal care documentation records supports the Commission's findings. None of the records contains the resident's or a supervisor's signature in the space for "supervisor/client signature." Instead, the space for "supervisor/client signature" contains the signature of an aide that administered services

10

to the recipient during one of the shifts on that particular day. Therefore, the personal care aides signed all records on behalf of the residents.

Appellant does not contest that the personal care records contain the aides' signatures instead of the recipient's or a supervisor's signature. Nevertheless, Appellant contends it adequately documented personal care services in the residents' medical administration records, which it suggests the Division did not request. In doing so, Appellant relies on its exhibits and testimony from Maxwell that all units billed for personal care services were for medication administration, not the dietary, grooming, bathing, toileting, or mobility services charted in the personal care documentation records it provided to the Division during the review.

The Commission, however, found Appellant's explanation as to how it billed solely for medication administration[8] as opposed to other personal care services to be incredible. First, the Commission concluded that the disclosure statement that Schulte provided to Appellant clearly conveyed that Appellant should furnish all records, including medical records, that could possibly support its personal care billings. Yet, Appellant did not disclose the medication administration records that it now contends

---

[8] In affirming the Division's decision, the Commission found that administering prescription medication is not a personal care service for which providers can be reimbursed. The Commission acknowledged that 13 C.S.R. § 70-91.010(2)(B)6 states that personal care services include "[a]ssisting with medication, including assisting with the self-administration of medicine[ and] applying nonprescription topical ointments or lotions." Nonetheless, the Commission found that assisting with medication does not include administering prescription medication due to language in section 13.1.C of the Division's Personal Care Manual, which provides that "[p]ersonal care providers are *not* reimbursed for . . . [a]dministering patent or prescribed medication[.]" The Personal Care Manual is incorporated by reference into the Division's regulations. *See* **13 C.S.R. § 70-3.030(1)(B)**. On appeal, Appellant continues to argue that administering prescription medication is a personal care service for which providers can be reimbursed. However, the Commission determined that, even if it accepted Appellant's argument that medication administration is a personal care service, it did not believe Appellant's contentions that all personal care service units for which it billed were for medication administration. It further concluded that Appellant failed to establish how the units of personal care services for which Appellant billed could be derived from the residents' medication administration records that Appellant admitted into evidence. Thus, we need not address Appellant's contentions regarding whether personal care services include the administration of prescription medication.

11

account for all billed personal care service units until after the Division completed its review. The Commission further concluded that Maxwell offered "internally contradictory" testimony that undermined Appellant's argument in that she testified that personal care service records were kept separate from medication records for billing purposes. The Commission also discredited Maxwell's testimony that Appellant would keep track of personal care tasks such as grooming, dietary, toileting, and mobility needs despite its residents supposedly not being in need of such services.

Appellant avers that the Commission's credibility determinations are erroneous because the Commission had to accept its exhibits and Maxwell's uncontroverted testimony regarding Appellant's billing procedures. However, as the sole judge of credibility, the Commission freely assesses the weight and value of all evidence and "is free to believe all, part, or none of the testimony of any witness." *Kerwin*, 375 S.W.3d at 227 n.8 (internal quotation omitted). Again, we "are not permitted to substitute our judgment for the judgment of the [Commission]." *Id.* at 230. Thus, because we cannot substitute our judgment for that of the Commission, we cannot say the Commission's finding of inadequate documentation is unsupported by substantial and competent evidence. Point denied.

In its fourth point, Appellant contends that the Commission erred in admitting Exhibit I into evidence. During the hearing, Schulte testified that Exhibit I was a 2008 letter from DHSS informing Appellant of the results of a review DHSS performed "as an agent of the [Division]." Schulte further testified that Exhibit I was a fair and accurate copy of the document DHSS sent to Appellant. Appellant objected to Exhibit I's admission as hearsay and argued that Schulte lacked knowledge to testify about the

12

letter because she did not write it. The Commission overruled the objection on the basis that the letter was a record of the Division because DHSS carried out the review as an agent of the Division.

Relying upon § 490.680,[9] Appellant asserts that the Division failed to lay the basic foundational requirements of a business record because Schulte lacked personal knowledge regarding "the manner in which the letter was written, by whom, and finally whether the letter was ever mailed or received by [Appellant]." This Court, however, has routinely held that § 490.680 does not pertain to administrative proceedings. **Whispering Oaks RCF Mgmt. Co. v. Mo. Dep't of Health & Senior Servs.**, 444 S.W.3d 492, 501 (Mo. App. W.D. 2014); **State ex rel. Sure-Way Transp., Inc. v. Div. of Transp. Dep't**, 836 S.W.2d 23, 26 (Mo. App. W.D. 1992). "Rather, section 536.070(10) governs the admissibility of business records in an administrative hearing." **Whispering Oaks**, 444 S.W.3d at 502.

Section 536.070(10) provides:

> Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of an act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of such evidence, but such showing shall not affect its admissibility.

Section 536.070(10), therefore, "relaxes the business record requirements and permits admission of the document if it shall appear that it was made in the regular course of any business." **Whispering Oaks**, 444 S.W.3d at 501 (internal quotation omitted). All

---

[9] Unless otherwise noted, all statutory citations are to RSMo 2000.

other circumstances as to the making of such writing or record "affect the weight of such evidence" but do "not affect its admissibility." **§ 536.070(10)**.

Appellant's complaints regarding Exhibit I concern Schulte's personal knowledge of the letter. Pursuant to § 536.070(1), such concerns do not affect Exhibit I's admissibility but rather its weight as evidence. Thus, the Commission did not err in admitting Exhibit I into evidence. Point denied.

In its fifth point, Appellant asserts that the Division acted with racial animus in issuing sanctions against Appellant. In particular, Appellant contends that Schulte's testimony establishes that the Division "first decided to impose a recoupment sanction of $180,000 on [Appellant]" and that such testimony clearly evidences a violation of Appellant's due process and equal protection rights in that the Division imposed the sanctions "only on account of the race or national origin of the owners of [Appellant's facility]."

When asked why the Division chose to examine Appellant's records for April through November of 2009, Schulte testified that "there's a date range that usually we have a dollar limit that we'll look at. And for this particular home, we started in April of '09 and November of '09 gave us some – somewhere between [$]150,000 and [$]200,000, which is our standard for review." Appellant asserts that such testimony evidences that the Division, from the outset, chose the amount of sanctions it wished to impose on Appellant. However, further testimony from Schulte clarified that the dollar amount was "not just for [Appellant's] review"; rather, in determining the time span of records to review, the Division always aims for a period in which the facility being

14

reviewed would have billed between $150,000-$200,000 for personal care services. Such testimony does not evidence any unconstitutional animus toward Appellant.

Moreover, despite its claims that the Division acted with racial animus toward Appellant's owners, Appellant fails to identify any evidence in the record that the Division's audit and subsequent sanctions were motivated by race. In fact, there is no evidence in the record regarding the race or nationality of Appellant's owners. Appellant relies solely upon the following exchange between its counsel and Schulte:

Q:	Okay. To your knowledge, did anybody inform you that they were not collecting a hundred percent of this thing because it was now owned and operated by a white person?

A:	Nobody told me anything, so it's –

Q:	You don't have any knowledge of it.

A:	I have no knowledge of why money was collected or not collected.

Appellant avers that such testimony indicates that the Division stopped seeking recoupment of current payments because, when Appellant went bankrupt, a white person took over the business in receivership. Such evidence, however, is insufficient to establish that the Division acted with racial animus toward Appellant. Point denied.

The decision of the Commission is affirmed.

_____
Joseph M. Ellis, Judge

All concur.

15